1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN KEITH PORTER, | Case No. 1:20-cv-01586-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security,[1] | |
| Defendant. | (Doc. 1) |

_____/

## I.    INTRODUCTION

On November 11, 2020, Plaintiff Brian Keith Porter ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 1383(c).  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

---

[1] On July 9, 2021, Kilolo Kijakazi was named Acting Commissioner of the Social Security Administration.  *See* https://www.ssa.gov/history/commissioners.html.  She is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in [their] official capacity, be the proper defendant").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (*See* Doc. 10.)

## II.    BACKGROUND

Plaintiff was born on November 10, 1971, has an eighth-grade education, and can communicate in English.  (Administrative Record ("AR") 25, 41, 65, 80, 267, 272, 324, 336.) Plaintiff filed a claim for SSI on December 14, 2017, alleging he became disabled on May 18, 1992, due to memory loss, anxiety, learning disability, panic attacks, back pain, shoulder pain, knee pain, leg pain, and hypertension.  (AR 65–66, 80–81, 106, 124, 267, 271, 318, 324, 336, 356.)  He thereafter amended his alleged onset date to December 14, 2017.  (AR 40.)

### A.    Relevant Evidence of Record[3]

#### 1.    Medical Evidence

Plaintiff was evaluated for mental health services by the California Department of Corrections while incarcerated in April 2017.  (AR 361–75.)  He was assessed with "Adjustment disorder with anxiety, Alcohol Dependence, [and] Meth dependence."  (AR 365.)  He reported taking psychiatric medications, and said he "has been engaging in mindfulness and relaxation exercises," which "help."  (AR 365.)

Plaintiff presented with musculoskeletal pain and cough in January 2018.  (AR 581–85.) His physical examination was normal, with proper orientation and appropriate mood and affect. (AR 584.)  He attended a follow up appointment for anxiety that same month, complaining of anxious/fearful thoughts, difficulty concentrating, fatigue, and restlessness.  (AR 575–79.)  His physical exam was normal, with no edema and normal memory, and he was assessed with anxiety and depressed mood.  (AR 578.)

In March 2018, Plaintiff underwent a psychological evaluation by Lance Portnoff, Ph.D. (AR 494–500.) Following the evaluation, Dr. Portnoff diagnosed Plaintiff with unspecified anxiety disorder, unspecified learning disorder, and mild neurocognitive disorder due to multiple etiologies (chronic alcohol use, hepatic disease).  (AR 499.)

In May 2018, Plaintiff reported stopping taking Sertraline because it "did not help," and wished to switch to "Xanax or Ativan."  (AR 567, 642.)  His physical examination was normal,

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

with no edema, proper orientation, appropriate mood and affect, normal insight, and normal judgment. (AR 567, 642.) Later that month, Plaintiff was deemed anxious at a follow up appointment. (AR 637.) He presented to the emergency department complaining of chest pain. (AR 513–23.) A physical examination was normal, with no swelling and cooperative and appropriate mood and affect. (AR 515.) He was given Ativan for anxiety. (AR 517.)

Plaintiff also presented for a follow up appointment with Rodrigo De Zubiria, M.D. in May 2018. Upon physical examination, Dr. De Zubiria found Plaintiff was pleasant and oriented, with appropriate mood and affect. (AR 555–56, 630–31.) He "appear[ed] to be functioning well" with his anxiety and was recommended to continue his medications and counseling. (AR 556, 631.) Dr. De Zubiria also placed a referral for psychiatry. (AR 556, 631.)

In June 2018, Plaintiff presented to Dr. De Zubiria for anxiety and reported he missed his DUI class because he was "not feeling well." (AR 621–26.) Upon physical examination, Plaintiff exhibited no edema and was pleasant and oriented, with appropriate mood and affect. (AR 624–25.) Dr. De Zubiria noted Plaintiff's anxiety was "stable," and he was to continue his current medications and keep his appointment with the psychiatrist. (AR 625.)

In July 2018, Plaintiff underwent testing for rheumatoid arthritis, which was negative. (AR 645.) He complained of intermittent musculoskeletal pain, with joint tenderness and swelling. (AR 608.) Tenderness with palpation was observed in Plaintiff's right wrist. (AR 610.) He was assessed with acute idiopathic gout and treated with medication. (AR 612.) That same month, Plaintiff presented to Dr. De Zubiria for anxiety. (AR 614–19.) Upon examination, Dr. De Zubiria found no edema, proper orientation, and appropriate mood and affect. (AR 618.) He recommended that Plaintiff continue seeing his psychiatrist. (AR 618.)

Plaintiff complained of anxious/fearful thoughts, depressed mood, difficulty concentrating, difficulty falling asleep, difficulty staying asleep, excessive worry, and fatigue in August 2018. (AR 595–601.) He stated that functioning was "somewhat difficult." (AR 595.) Upon physical examination, he exhibited no edema and was pleasant and oriented, with appropriate mood and affect. (AR 599.) "Related symptoms" were noted to be "poorly controlled" while "improvement of initial symptoms" was noted. (AR 595.)

1    Plaintiff also complained of hand pain in August 2018.  (AR 779–91.)  He was wearing a

2    splint and was recommended to continue its use.  (AR 784.)  Plaintiff also noted he had received

3    interarticular injections.  (AR 784, 790.)  That same month, Plaintiff complained of right wrist pain

4    to Dr. De Zubiria.  (AR 602–07.)  He was assessed with acute idiopathic gout of the right hand,

5    which was noted to be "clinically much better."  (AR 606.)  Plaintiff's physical examination results

6    were normal, as before.  (AR 606.)  An x-ray of Plaintiff's right wrist showed no acute findings.

7    (AR 792.)

8    In September 2018, Plaintiff presented for treatment for hypertension, right-hand, and right-

9    wrist pain.  (AR 759–78.)  The physical examinations of Plaintiff were normal, with no edema,

10   proper orientation, and appropriate mood and affect.  (AR 763, 770, 777.)  During one appointment,

11   Dr. De Zubiria noted that Plaintiff' chronic right wrist pain was "very likely gout."  (AR 770.)  He

12   also noted that the gout was "responding well" to medication.  (AR 764.)  In November 2018, Dr.

13   De Zubiria recorded a normal physical examination of Plaintiff, with no edema, proper orientation,

14   and appropriate mood and affect.  (AR 756.)  Dr. De Zubiria noted the acute idiopathic gout in

15   Plaintiff's right wrist was "much better" and medications "well tolerated."  (AR 756.)

16   Plaintiff complained of cold symptoms in January 2019.  (AR 738–44.)  No cyanosis was

17   noted, and all four extremities was normal.  (AR 743.)

18   In February 2019, Plaintiff presented to Dr. De Zubiria for treatment for gout in his right

19   wrist.  (AR 730–37.)  His physical examination was normal, with no edema, proper orientation,

20   and appropriate mood and affect.  (AR 735.)

21   Plaintiff again complained of musculoskeletal pain in his right wrist in April 2019, and was

22   noted to have moderate pain with motion.  (AR 715–20.)  He was advised by Dr. De Zubiria to

23   continue his medication and avoid alcohol.  (AR 720.)

24   In May 2019, Plaintiff had an upper respiratory infection.  (AR 707–13.)  No cyanosis was

25   noted, and all four extremities were normal.  (AR 712.)

26   In June 2019, Plaintiff complained to Dr. De Zubiria of hypertension.  (AR 692–99.)  Dr.

27   De Zubiria's examination of Plaintiff was normal, as before.  (AR 697.)

28   Plaintiff's physical examination in September 2019 was normal, except for some swelling

in his right foot.  (AR 689.)  Dr. De Zubiria observed that Plaintiff's acute idiopathic gout in that foot was "clinically stable," and his generalized anxiety disorder was "well controlled."  (AR 689–90.)  He was advised to continue his current medications for gout and anxiety.  (AR 689–90.)

In November 2019, Plaintiff presented to Dr. De Zubiria for a follow up appointment for hypertension and anxiety.  (AR 677–83.)  He found Plaintiff oriented to time, place, person, and situation, with appropriate mood and affect, and indicated an absence of edema.  (AR 681.) Plaintiff was assessed with generalized anxiety disorder, with which he was doing "clinically well," and was advised to continue seeing a psychiatrist.  (AR 681.)

Plaintiff presented for a psychiatric follow up in March 2020, and complained about memory problems, lack of sleep, and anxiety.  (AR 801–803.)  He reported being admitted to the emergency department for an anxiety attack in late 2019.  (AR 801.)  According to Plaintiff, hydroxyzine "helps a lot, relaxes me more [and] makes me sleepy" and he "need[s] Ativan for anxiety," but not Paxil  (AR 801.)  He was assessed with generalized anxiety disorder and major depressive disorder.  (AR 802.)  Plaintiff was continued on psychiatric medications and recommended to "[c]ontinue supportive therapy with therapist."  (AR 803.)

### 2. Opinion Evidence

Dr. De Zubiria completed a "Physical Residual Functional Capacity" questionnaire in April 2019.  (AR 793–800.)  He first opined that Plaintiff had no exertional limitations, checking the box for "none established," but then found that he could frequently lift less than 10 pounds and sit for about 6 hours in an 8-hour workday, observing that Plaintiff has a history of "moderate to severe gout" that is exacerbated by "mild trauma and physical labor."  (AR 794.)  Dr. De Zubiria further found that Plaintiff could frequently perform postural activities.  (AR 795.) He concluded by stating Plaintiff "has a long history of limited intellectual capacity, poor memory, generalized anxiety and symptoms suggestive of post-traumatic stress disorder.  In combination with his chronic pain/gout issues this combination of symptoms make him very unlikely to successfully function in most/any work environment.  [Plaintiff] has a long history of disability and essentially no work history which make[s] him essentially unemployable."  (AR 798.)

///

**B.     Plaintiff's Statement**

In December 2017, Plaintiff completed an adult function report.  (AR 293–301.)  Plaintiff reported he becomes "very nervous" when asked to perform certain tasks and does not complete the tasks because he forgets the instructions.  (AR 293.)  He "feel[s] a lack of confidence in [him]elf and never seem to finish something once [he] start[s] it."  (AR 293.)  When asked to describe what he does from the time he wakes until he goes to bed, Plaintiff reported he sometimes takes a shower, waits for breakfast, checks the mail, sometimes walks, and watches television until bedtime.  (AR 294.)  He gets anxiety at night and his mind "running" keeps him awake.  (AR 294.)  Plaintiff reported he has no problem with personal care.  (AR 294.)  He sometimes forgets to take medication or attend doctor's appointments.  (AR 295.)

Plaintiff sometimes cooks meals and helps with housework "on good days."  (AR 295.)  He reports walking almost every day.  (AR 296.)  He can go out alone and shops in stores with his mother once a week.  (AR 296.)  Plaintiff reported being able to handle his finances and spend time with family members.  (AR 296–97.)

**C.     Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on April 3, 2018, and again on reconsideration on September 7, 2018.  (AR 106–110, 124–29.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 130–44.)  The ALJ conducted a hearing on April 7, 2020.  (AR 37–64.)  Plaintiff appeared at the hearing with his attorney and testified as to his alleged disabling conditions.  (AR 41–57.)

**1.     Plaintiff's Testimony**

Plaintiff testified he has an eighth-grade education has never worked full-time.  (AR 41.)  He testified he was unable to work because he is "a very nervous person," has anxiety, and gets confused in the middle of tasks.  (AR 42.)  He has seen a therapist and psychiatrist, but when insurance would only cover one, he continued treatment with his psychiatrist only.  (AR 42–43.)  Plaintiff testified that his medication dosage has been increased but it has "not really" helped his symptoms.  (AR 43.)  Counseling is beneficial.  (AR 43.)  He has "daily" panic attacks, which are triggered when he must go or do something he doesn't want to.  (AR 53.)  His anxiety affects his

1  ability to focus and concentrate.  (AR 53–54.)

2      Plaintiff stated he lives with his mother and his brother.  (AR 43.)  He has three children,
3  who he sees once a month.  (AR 45.)  He goes to the park and plays pool with his children and
4  grandchild.  (AR 46.)  In a typical day, he watches television and takes the trash out.  (AR 47.)
5  He can prepare simple meals in the microwave.  (AR 47.)  According to Plaintiff, he will go
6  grocery shopping with his mother once a month.  (AR 48.)  He mainly watches television and can
7  concentrate on a program.  (AR 53.)

8      Plaintiff testified he takes medication for gout and his mother reminds him to take his
9  medicines.  (AR 44.)  The medication helps, except for when his gout "flares up" every four or
10  five months, lasting for a month or longer.  (AR 44.)  Plaintiff stated that these flares typically
11  occur in his foot or wrists, with swelling.  (AR 44.)  It causes him pain and restricts his movement,
12  so much so that he cannot perform basic hygiene or use a pen or pencil.  (AR 50–51.)  Plaintiff
13  testified that when his foot flares up he cannot walk.  (AR 52.)

14      As a condition of his parole, he had to attend classes, which took him eight to ten months
15  to complete.  (AR 48–49.)  He said the classes should have taken him four months to complete,
16  but some days he "just couldn't make it" and he "didn't feel good."  (AR 49.)  According to
17  Plaintiff, he was "sick with the anxiety" and felt like he couldn't attend.  (AR 55.)

18      **2.**     **Vocational Expert's Testimony**

19      A Vocational Expert ("VE") also testified at the hearing.  (AR 58–64.)  The ALJ asked the
20  VE to consider a person of Plaintiff's age, education, and with his work experience and posed a
21  series of hypotheticals about this person.  (AR 58–61.)  The VE was to assume this person can
22  perform work at the light exertional level with the following additional limitations: this individual
23  can frequently handle with the right upper extremity; they can perform work that needs little or no
24  judgment to do simple duties that can be learned on the job in a short period of time of up to 30
25  days; this individual can sustain ordinary routines, understand, carry out, and remember simple
26  instructions, and use judgment in making simple, work-related decisions; they can attend and
27  concentrate for two-hour periods totaling a normal eight-hour workday with usual work breaks;
28  this individual can respond appropriately to supervision, coworkers, and usual work situations; they

can tolerate occasional interaction with coworkers, and brief, superficial interaction with the general public on a less than occasional basis; this individual can deal with changes in a routine work setting; they can perform low-stress work, which is defined as work requiring most occasional decisions and occasional changes in work duties and tasks; and this individual can work at a consistent pace throughout the workday, but not at a production-rate pace where each task must be completed within a strict time deadline.  (AR 58–59.)  The VE testified that such a person could perform jobs in the national economy, such as price marker, Dictionary of Operational Titles (DOT) code 209.587-034, which was light work, with a specific vocational preparation (SVP)[4] of 2; cleaner, DOT code 23.687-014, light work, with an SVP of 2; and routing clerk, DOT code 222.687-022, light work, with an SVP of 2.  (AR 59.)

The ALJ asked the VE, in a second hypothetical, to consider an individual with the sane limitations as set forth in the first hypothetical, but with the following additional limitations: this individual can perform sedentary exertional work and they can frequently handle, finger, and feel with the right dominant upper extremity.  (AR 59–60.)  The VE testified that such a person could perform sedentary jobs in the national economy, such as document preparer, DOT code 249.587-018, with an SVP of 2; escort vehicle driver, DOT code 919.663-022, with an SVP of 2; surveillance system monitor, DOT code 379.367-010, with an SVP of 2; and addresser, DOT code 209.587-010, with an SVP of 2.  (AR 60.)

In a third hypothetical, the VE was asked to consider a person of Plaintiff's age, education, and with his work experience, who has the following limitations: can frequently lift and/or carry less than 10 pounds; can sit for about six hours in an eight-hour workday; can frequently climb ladders, ropes, scaffolds, ramps, or stairs; can frequently balance, stoop, kneel, crouch, and crawl; would be absent from work approximately four days per month due to anxiety; and would be off task approximately 20% of the workday.  (AR 60–61.)  The VE testified that there would be no work such a person could perform.  (AR 61.) The same was true for a person from hypothetical

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

one who would be off task 15% or more of the workday or absent more than one day a month.  (AR 61–62.)

**D.      The ALJ's Decision**

In a decision dated May 5, 2020, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 15–27.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920.  (AR 17–27.)  The ALJ decided that Plaintiff had not engaged in substantial gainful activity since December 14, 2017, the amended alleged onset date (step one).  (AR 17.)  At step two, the ALJ found Plaintiff's following impairments to be severe: adjustment disorder with alcohol and methamphetamine dependence; generalized anxiety disorder; unspecified learning disorder; mild neurocognitive disorder; depressive disorder; and gout.  (AR 18.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 18–19.)

The ALJ then assessed Plaintiff's RFC and applied the assessment at steps four and five.  *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff had the RFC:

> to perform light work as defined in 20 CFR [§] 416.967(b) except he can frequently handle with the right upper extremity.  He can perform work that needs little or no judgment to do simple duties that can be learned on the job in a short period of time of up to 30 days.  He can sustain ordinary routines, understand, carry out and remember simple instructions, and use judgment in making simple work-related decisions.  He can attend and concentrate for two-hour periods totaling a normal eight-hour workday with usual work breaks. He can respond appropriately to supervision, co-workers, and usual work situations.  He can tolerate occasional interaction with co-workers and brief superficial interaction with the general public on a less than occasional basis.  He can deal with changes in a routine work setting.  He can perform low stress work, which is defined as work requiring at most occasional decisions and occasional changes in work duties and tasks. He can work at a consistent pace throughout the workday but not at a production rate pace where each task must be completed within a strict time deadline.

(AR 20–25.)   Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" they rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (AR 22.)

The ALJ determined that Plaintiff had no past relevant work (step four) but that, given his mental residual functional capacity (RFC)[5], he could perform a significant number of other jobs in the local and national economies, specifically price marker, cleaner, and routing clerk (step five).  (AR 25–26.)   Ultimately, the ALJ concluded that Plaintiff was not disabled from December 14, 2017, through the date of their decision.  (AR 26–27.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on September 28, 2020.  (AR 1–6.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

### III.   LEGAL STANDARD

#### A.   Applicable Law

An individual is considered "disabled" for purposes of disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that [they] are not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining

---

[5] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner.") (citations omitted).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'"  *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'"  *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.     DISCUSSION

Plaintiff contends the ALJ erred in failing to properly articulate the reasons for rejecting the

opinion of Plaintiff's treating physician Dr. De Zubiria regarding Plaintiff's physical limitations. He also contends the ALJ failed to articulate clear and convincing reasons for rejecting Plaintiff's subjective-symptom testimony. Plaintiff therefore requests this Court remand for further proceedings. (Docs. 17, 19.)

The Commissioner contends that the ALJ reasonably considered Dr. De Zubiria's opinion, and that substantial evidence supports the ALJ's evaluation of Plaintiff's symptoms. (Doc. 18.) The Court agrees with the Commissioner.

## A.      The ALJ's Treatment of Dr. De Zubiria's Opinion Was Not Erroneous

### 1.      Legal Standard

Plaintiff's claim for SSI is governed by the agency's "new" regulations concerning how ALJs must evaluate medical opinions for claims filed on or after March 27, 2017.  20 C.F.R. § 416.920c.  The regulations set "supportability" and "consistency" as "the most important factors" when determining the opinions' persuasiveness.  20 C.F.R. § 416.920c(b)(2).  And although the regulations eliminate the "physician hierarchy," deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [they] considered the medical opinions" and "how persuasive [they] find all of the medical opinions."  20 C.F.R. § 416.920c(a)–(b).

Recently, the Ninth Circuit has issued the following guidance regarding treatment of physicians' opinions after implementation of the revised regulations:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant.  *See* 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources.").  Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, *see Murray*, 722 F.2d at 501–02, is likewise incompatible with the revised regulations.  Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).  Accordingly, under the new regulations, "the decision to discredit any medical opinion, must simply be supported by substantial evidence."  *Id.*

1    at 787.

2          In conjunction with this requirement, "[t]he agency must 'articulate . . . how persuasive' it

3    finds 'all of the medical opinions' from each doctor or other source, and 'explain how [it]

4    considered the supportability and consistency factors' in reaching these findings." *Woods*, 32 F.4th

5    at 792 (citing 20 C.F.R. § 404.1520c(b)).  *See also id*. § 416.920c(b).  "Supportability means the

6    extent to which a medical source supports the medical opinion by explaining the 'relevant . . .

7    objective medical evidence.'"  *Id*. at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)).  *See also id*. §

8    416.920c(c)(1).  "Consistency means the extent to which a medical opinion is 'consistent . . . with

9    the evidence from other medical sources and nonmedical sources in the claim.'"  *Id*. at 792 (quoting

10   20 C.F.R. § 404.1520c(c)(2)).  *See also id*. § 416.920c(c)(2).

11         As the Ninth Circuit also observed,

12   > The revised regulations recognize that a medical source's relationship with the
     > claimant is still relevant when assessing the persuasiveness of the source's opinion.
13   > *See id*. § 404.1520c(c)(3).  Thus, an ALJ can still consider the length and purpose
     > of the treatment relationship, the frequency of examinations, the kinds and extent of
14   > examinations that the medical source has performed or ordered from specialists, and
     > whether the medical source has examined the claimant or merely reviewed the
15   > claimant's records. *Id*. § 404.1520c(c)(3)(i)–(v).  However, the ALJ no longer needs
16   > to make specific findings regarding these relationship factors:

17   *Woods*, 32 F.4th at 792.  "A discussion of relationship factors may be appropriate when 'two or

18   more medical opinions . . . about the same issue are . . . equally well-supported . . . and consistent

19   with the record . . . but are not exactly the same.'"  *Id*. (quoting § 404.1520c(b)(3)).  *See also id*. §

20   416.920c(b)(3).  "In that case, the ALJ 'will articulate how [the agency] considered the other most

21   persuasive factors.'"  *Id*.  Finally, if the medical opinion includes evidence on an issue reserved to

22   the Commissioner, the ALJ need not provide an analysis of the evidence in his decision, even in

23   the discussions required by 20 C.F.R. §§ 404.1520c, 416.920c.  *See* 20 C.F.R. §§ 404.1520b(c)(3),

24   415.920b(c)(3).

25         With these legal standards in mind, the Court reviews the weight given to Dr. De Zubiria's

26   opinion.

27         **2.     Analysis**

28         In weighing Dr. De Zubiria's opinion related to Plaintiff's physical functioning, the ALJ

reasoned as follows:

> The undersigned finds this opinion to be unpersuasive because it is internally inconsistent. For instance, Dr. De Zubiria opined that the claimant is able to frequently lift 10 pounds, but noted that the claimant had no exertional limitations (13F/2). Moreover, he did not explain why the claimant is limited to sitting six hours when he indicated that the physical labor exacerbates the claimant's condition (id.). The opinion is also not supported by treatment records, which noted that the claimant's gout was clinically stable (12F/15, 91). In addition, the undersigned finds this opinion not consistent with the physical examinations, which show that the claimant generally had normal examinations with no edema (6F/8; 8F/21, 32; 9F/11, 18, 30, 37, 42; 12F/7, 23, 38, 61, 69, 82). Furthermore, he opined that the claimant was unable to work, which the undersigned finds unpersuasive because that is an issue reserved to the Commissioner (see 20 CFR 404.1527, 416.927).

(AR 24.)

The Court concludes that the ALJ properly evaluated the supportability and consistency of Dr. De Zubiria's opinion. As to supportability, the ALJ found Dr. De Zubiria's opinion internally inconsistent because he assigned lifting, carrying, and sitting restrictions that conflict with his opinion that Plaintiff had no exertional limitations. Internal inconsistency in a physician's opinion is a specific and legitimate reason to find an opinion less persuasive. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (holding that an ALJ may cite internal inconsistencies in a physician's opinion). Plaintiff contends that the ALJ erred in seeking clarification of Dr. De Zubiria's opinion, but nothing in the ALJ's decision implies that they believed that opinion was ambiguous, such that their duty to develop the record would be triggered. *See Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). *See also Clark v. Berryhill*, No. C16-1328-JPD, 2017 WL 1229218, at *6 (W.D. Wash. Apr. 4, 2017) ("The existence of an internally inconsistent medical opinion does not necessarily trigger the ALJ's duty to develop the record.") (citations omitted).

The ALJ also determined Dr. De Zubiria's opinion was not supported by his own treatment notes and objective findings. For example, the ALJ cited Dr. De Zubiria's note in August 2018 that Plaintiff's gout was "clinically much better" and his physical examination results normal. (AR 23, 606.) In September 2018, Dr. De Zubiria observed that the gout was "responding well" to medication. (AR 764.) He recorded a normal physical examination of Plaintiff in November 2018, stating that the gout in Plaintiff's right wrist was "much better" and medications "well tolerated."

(AR 756.)  Plaintiff's physical examinations performed by Dr. De Zubiria continued to be normal in February and June 2019.  (AR 697, 735.)  As the ALJ observed, Dr. De Zubiria deemed the gout in Plaintiff's right foot "clinically stable" in September 2019.  (AR 24, 689–90.)  A subsequent physical examination performed by Dr. De Zubiria in November 2019 was normal.  (AR 681.)  The lack of support by Dr. De Zubiria's own treatment notes and objective findings was a proper consideration in evaluating the supportability of his opinion.  *See, e.g., Trezona v. Comm'r of Soc. Sec.*, No. 1:21-CV-00792-EPG, 2022 WL 1693493, at *3 (E.D. Cal. May 26, 2022); *Amanda B. v. Comm'r, Soc. Sec. Admin*., No. 1:20-CV-01507-YY, 2022 WL 972408, at *7 (D. Or. Mar. 31, 2022).

As to consistency, the ALJ found Dr. De Zubiria's opinion concerning Plaintiff's physical limitations was generally inconsistent with the other medical evidence, including physical examinations in the record.  As cited by the ALJ, Plaintiff's physical examinations were routinely normal, with no edema, swelling, or cyanosis present, in January 2018 (AR 578, 584), May 2018 (AR 515, 567, 642), August 2018 (AR 599), September 2018 (AR 763, 770, 777), January 2019 (AR 743), and May 2019 (AR 712).  These are in addition to the physical examinations performed by Dr. De Zubiria, which, as discussed above, were also consistently normal.  (*See* AR 681, 697, 735.)  While the medical record reflects that Plaintiff has physical impairments, it was reasonable for the ALJ to conclude that the record did not support the severity of Dr. De Zubiria's opined restrictions, including that Plaintiff could only frequently lift less than 10 pounds.  Thus, the ALJ's findings that Dr. De Zubiria's opinions were inconsistent with the objective medical evidence as a whole are legally sufficient and supported by substantial evidence.  *See Batson v. Comm'r Soc. Sec. Admin*., 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion.").

Lastly, that Dr. De Zubiria's opinion touched on "an issue reserved to the Commissioner" is not an appropriate reason to deem the opinion wholly unpersuasive.  While the disability determination is reserved for the Commissioner, Dr. De Zubiria's opinion also rendered medical opinions as to Plaintiff's impairments and symptoms.  Plaintiff is correct that the ALJ was not free to disregard Dr. De Zubiria's medical opinion on Plaintiff's impairments and symptoms simply

because he additionally rendered an opinion on an issue reserved to the Commissioner.  *See McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) (noting than "[a]n impairment is a purely medical condition" but "[a] disability is an administrative determination").  However, any error in connection with this finding is harmless because the ALJ provided other valid reasons for discounting Dr. De Zubiria's opinion, as discussed above.  *See, e.g., Carmickle v. Comm'r of Soc. Sec. Admin*., 533 F.3d 1155, 1162 (9th Cir. 2008) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions ...' and the error 'does not negate the validity of the ALJ's ultimate ... conclusion,' such is deemed harmless and does not warrant reversal." (quoting *Batson*, 359 F.3d at 1197).

In sum, the Court finds that the ALJ's reasons for the weight given to Dr. De Zubiria's opinion are legally sufficient and supported by substantial evidence.

**B.     The ALJ Properly Discounted Plaintiff's Subjective Symptom Allegations**

**1.     Legal Standard**

The test for deciding whether to accept a claimant's subjective symptom testimony turns on whether the claimant produces medical evidence of an impairment that reasonably could be expected to produce the symptoms alleged.  *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *Smolen v. Chater*, 80 F.3d 1273, 1281–82 & n.2 (9th Cir. 1996).  The Commissioner may not discredit a claimant's testimony on the severity of symptoms merely because they are unsupported by objective medical evidence. *Reddick*, 157 F.3d at 722*; Bunnell*, 947 F.2d at 343, 345.  If the ALJ finds the claimant's testimony not credible, the ALJ "must specifically make findings which support this conclusion."  *Bunnell*, 947 F.2d at 345.  The ALJ must set forth "findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002); *see also Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Bunnell*, 947 F.2d at 345-46.  Unless there is evidence of malingering, the ALJ can reject the claimant's testimony about the severity of a claimant's symptoms only by offering "specific, clear and convincing reasons for doing so."  *Smolen*, 80 F.3d at 1283-84; *see also Reddick*, 157 F.3d at 722.  The ALJ must identify what testimony is not credible and what evidence discredits the

1 | testimony.  *Reddick*, 157 F.3d at 722; *Smolen*, 80 F.3d at 1284.

2 | **2.    Analysis**

3 | As noted above, in determining Plaintiff's RFC, the ALJ concluded that Plaintiff's

4 | medically determinable impairments reasonably could be expected to cause the alleged symptoms.

5 | (AR 22.)   The ALJ, however, also found that Plaintiff's statements regarding the intensity,

6 | persistence and limiting effects of these symptoms were "not entirely consistent" with the RFC.

7 | (AR 22.)  Because the ALJ did not make any finding of malingering, they were required to provide

8 | clear and convincing reasons supported by substantial evidence for discounting Plaintiff's

9 | subjective symptom allegations.  *Smolen*, 80 F.3d at 1283-84; *Tommasetti*, 533 F.3d at 1039–40.

10 | Here, the ALJ provided at least two valid reasons for not fully recrediting Plaintiff's

11 | testimony and allegations.

12 | a.    Improvement with Treatment

13 | First, the ALJ found that Plaintiff's subjective symptom testimony is inconsistent with the

14 | medical evidence, specifically records showing improvement with treatment.   (AR 23.)   In

15 | evaluating a claimant's claimed symptoms, an ALJ may find a plaintiff less credible when their

16 | symptoms can be controlled by treatment and/or medication.  *See* 20 C.F.R. § 416.929(c)(3)(iv)–

17 | (v); *see also Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be

18 | controlled effectively with medication are not disabling for purposes of determining eligibility for

19 | [disability] benefits.").  Here, there is substantial evidence in the record, as set forth above, that

20 | Plaintiff's physical condition improved with medication, such that physical examinations during

21 | the relevant period were normal.   (*See* AR 606 (gout "clinically much better" and physical

22 | examination results normal); AR 764 (gout was "responding well" to medication); AR756 (gout in

23 | Plaintiff's right wrist was "much better," medications "well tolerated," and normal physical

24 | examination); AR 689–90 (gout in Plaintiff's right foot "clinically stable"); AR 515, 567, 578, 584,

25 | 599, 606, 642, 681, 697, 712, 735, 743, 763, 770, 777 (normal physical examinations).)

26 | The medical evidence of record, as summarized by the ALJ, also shows that Plaintiff's

27 | mental condition had improved with medications and psychiatric counseling during the relevant

28 |

period.[6]  For example, Plaintiff "appear[ed] to be functioning well" despite his anxiety in May 2018.  (AR 556, 631.)  That next month, his anxiety was deemed "stable."  (AR 625.)  Treatment notes from September and November 2019 observed Plaintiff's generalized anxiety disorder was "well controlled" with medication, and he was doing "clinically well."  (AR 681, 689–90.)  In March 2020, Plaintiff himself reported that his medication "helps a lot," relaxes him, and aids in sleep. (AR 801.)  Plaintiff's consistently normal mental status examinations during this time period, as cited by the ALJ, further demonstrate improvement.  (*See* AR 555–56, 567, 578, 584, 599, 606, 618, 624–25, 630–31, 642, 681, 689, 697, 735, 756, 763, 770, 777.)

As there is substantial evidence of Plaintiff's improvement with treatment, such is a clear and convincing reason for discounting his subjective symptom testimony.  *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (ALJ's adverse credibility determination properly accounted for physician's report of improvement with medication); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983) (affirming denial of benefits and noting that claimant's impairments were responsive to treatment).

### b.   Activities of Daily Living

The ALJ next determined that Plaintiff's activities of daily living undermine his assertions of debilitating mental and physical impairments.  (AR 24–25.)  The ALJ noted that Plaintiff socialized with family and got along with them.  (AR 23, 296–97.)  He went to the park and played pool during visits with his three children.  (AR 23–24, 45–46.)  As noted by the ALJ, Plaintiff also shopped in grocery stores, prepared basic meals, took out the trash, went outside and traveled alone, performed personal care (bathing, dressing, and grooming) independently, watched the news with his mother, and handled his finances on his own.  (AR 23–24, 46, 47, 48, 53, 294, 295, 296.)  While

---

[6] In rejecting Plaintiff's subjective complaints, the ALJ also characterized the treatment of Plaintiff's mental impairments as "conservative."  (AR 23.)  It is unclear whether counseling and psychiatric medications constitutes conservative treatment.  (*See, e.g.*, AR 327, 341, 436.)  *See McKenzie v. Kijakazi*, No. 1:20-CV-0327 JLT, 2021 WL 4279015, at *8 (E.D. Cal. Sept. 21, 2021) (ALJ erred by finding claimant's prescribed treatment of Xanax, Latuda, Zoloft, and Hydroxyzine conservative).  The Court, however, does not need to reach that determination here because the ALJ provided other valid reasons for discrediting Plaintiff's subjective complaints.  *See Reyes v. Berryhill*, 716 F. App'x 714, 714 (9th Cir. 2018) (where ALJ provided valid reasons for discounting claimant's testimony, "[a]ny error in other reasons provided by the ALJ was harmless"); *Batson*, 359 F.3d at 1197; *Williams v. Comm'r, Soc. Sec. Admin.*, Civ. No. 6:16–cv–01543–MC, 2018 WL 1709505, *3 (D. Or. Apr. 9, 2018) ("Because the ALJ is only required to provide a single valid reason for rejecting a claimant's pain complaints, any one of the ALJ's reasons would be sufficient to affirm the overall . . . determination.").

Plaintiff did attribute his initial absenteeism to his parole classes to anxiety (*see* AR 55)—contrary to the ALJ's finding (*see* AR 23)—he nevertheless was able to complete the program by attending every day (*see* AR 49).

An ALJ may properly consider a claimant's daily activities when evaluating credibility. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (the nature of daily activities may be considered when evaluating credibility).   Moreover, in evaluating a claimant's credibility, an ALJ may consider inconsistencies between the claimant's testimony and the claimant's conduct and whether the claimant engages in daily activities inconsistent with the alleged symptoms.  *Molina*, 674 F.3d at 1112.  Even where those activities suggest some difficulty functioning, they are grounds for discrediting Plaintiff's testimony to the extent that they contradict claims of a totally debilitating impairment.  *Id.* at 1113.  *See also Smolen*, 80 F.3d at 1284 ("[O]rdinary techniques of credibility evaluation" may be considered, such as prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid."); *Alonzo v. Colvin*, No. 1:14–cv–00460–SKO, 2015 WL 5358151 at *17 (E.D. Cal. Sept. 11, 2015) (one inconsistent statement "comprised a clear and convincing reason to discount Plaintiff's credibility").

While disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations, where the level of activity is inconsistent with a claimant's claimed limitation, those activities have bearing on the claimant's credibility.  *Reddick*, 157 F.3d at 722. As the Ninth Circuit explained in *Fair*, 885 F.2d at 604, "if [the plaintiff] remains able to perform ordinary household and personal tasks, then [they have] not carried [their] burden of proving that [their] pain prevents [them] from returning to [work].  While such reasoning may not hold up in all cases . . . it is sufficient here, as [the plaintiff] has not put forward any evidence that reconciles the inconsistency between [their] words and [their] actions."  Such circumstances are present in this case.  The ALJ's decision recognizes that Plaintiff has some work limitations, however, they properly discredited Plaintiff's testimony that his limitations render him completely unable to work. *Fair*, 885 F.2d at 604; *see also Bunnell*, 947 F.2d at 346 ("So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence.").  Where the ALJ

1  makes a reasonable interpretation of the claimant's testimony, it is not the Court's role to second-
2  guess it. *Rollins*, 261 F.3d at 857.

3       The Court therefore finds the ALJ discounted Plaintiff's subjective symptom allegations
4  for clear and convincing reasons supported by substantial evidence.

5  **V.**        **CONCLUSION AND ORDER**

6       After consideration of Plaintiff's and the Commissioner's briefs and a thorough review of
7  the record, the Court finds that the ALJ's decision is supported by substantial evidence and is
8  therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of
9  Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff.

10
11  IT IS SO ORDERED.

12  Dated:    **August 9, 2022**                       */s/ Sheila K. Oberto*
13                                        UNITED STATES MAGISTRATE JUDGE

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28